## Hughes v. Commonwealth.

(Decided January 22, 1918).

Appeal from Oldham Circuit Court.

1. Homicide—Trial—Verdict—Evidence.—Where accused was found guilty of murder, evidence that he, having had a quarrel with a teamster over a trivial matter, left him and in about three-quarters of an hour returned with a shot gun and shot and killed the teamster without further or any provocation, shows malice and supports the verdict of guilt.

2. Homicide—Evidence—Malice.—The fact that, at the time of the killing, the accused was slightly intoxicated, or that previous thereto he and his victim were friends, cannot be held as a matter of law to refute an inference of malice.

S. E. DE HAVEN for appellant.

CHARLES H. MORRIS, Attorney General, and OVERTON S. HOGAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CLARKE—Affirming.

This is an appeal from a judgment of the Oldham circuit court rendered upon a verdict convicting the appellant of the crime of murder and fixing his punishment at death. Only one reason is suggested for a reversal, and that is, neither malice nor any fact authorizing an inference of malice was conclusively proved, that the verdict is, therefore, against the evidence, which authorized a verdict of guilt only under the manslaughter instruction.

On December 20, 1916, about nine o'clock in the evening, the defendant shot and killed Henry Ritter near Goshen in Oldham county, as they were returning from Louisville. Defendant was driving a wagon and was followed by two other wagons, the one immediately behind him being driven by the decedent, Henry Ritter, while the rear wagon was being driven by Curtis Bryant. Julius Lang was riding in the front wagon with the defendant. Near the bottom of a hill, about a half mile out of Goshen, all the wagons were stopped and a difficulty arose between the defendant and Curtis Bryant over a trivial matter, in which the decedent, Henry Ritter, became involved with the defendant by attempting to make him stop cursing Bryant. Defendant then started cursing Ritter, when the latter, with a chain in his hand, threatened to strike the defendant, if he did not quit cursing him. The de-

fendant, who, at the time, was standing in his wagon, started up his team and drove off at a trot, leaving behind the other two wagons which proceeded in the same direction but more slowly. When reaching the top of the hill, the defendant procured a shot gun from the home of a Mr. Washburn, which he acknowledged he procured for the purpose of settling the difficulty with Ritter. Without disclosing his purpose to Julius Lang, whom he directed to drive the team on into Goshen and to wait there for him while he went back to see what was delaying the other wagons, the defendant returned back down the road until he met the wagon Ritter was driving, when, according to his testimony, he asked Ritter, "Is everything all right?" to which Ritter replied, "No, by God, I am going to get you, it is not all right," and about that time he shot him. Curtis Bryant states that when the defendant reached the side of the wagon Ritter was driving, he said to him, "Henry, is everything all right?" and that Ritter replied, "Yes, Joe, everything is all right."; that the defendant asked Ritter the same thing three times and each time received the same answer, when the defendant said "Shut up," and fired the shot that killed Ritter; that, at the time, Ritter was standing up in the wagon driving his team, with his head only turned partially toward the defendant and making no demonstration whatever toward him. About three-quarters of an hour intervened between the killing and the angry discussion, which occurred at the bottom of the hill.

If these facts do not conclusively prove malice, and exclude an inference of any other motive for the killing it would be hard to imagine how, in any case, it could be proved. The only excuse for the killing suggested by counsel for the defendant is heat and passion engendered by the fuss that occurred over a very trivial matter more than three-quarters of an hour before the killing, during which time the defendant had ample opportunity to free himself from any sudden heat and passion that might have possessed him at the time of the first difficulty. That he left the decedent and procured a shot gun with the avowed purpose of settling the difficulty and then returned and, without more ado, slew his victim, can be explained upon no other inference but that the defendant was actuated by such malice as is seldom exhibited. Nor can the fact that the defendant was, at the time, slightly intoxicated, or that, previous to the difficulty, he and his

victim had been friends, be held as a matter of law to refute such an inference.

To hold, under such circumstances, that there was an absence of proof of malice, it would be necessary without any sufficient reason suggested or imaginable therefor to overrule innumerable decisions of this court and to rewrite the whole law upon the subject, with the result that it would be practically impossible ever to secure a conviction of murder. Counsel for defendant does not cite any decision of any court in support of his contention, as, of course, he could not, and his position is so manifestly unsound as to obviate the necessity for further discussion or citation of authority.

As stated, this is the only reason for a reversal urged upon us by counsel in brief; but, since the death penalty is inflicted, we have carefully examined the whole record to be sure that there was no prejudicial error in the trial of the defendant, and none was discovered. The court gave to the jury instructions, which were free of error, upon murder, manslaughter, self-defense, and reasonable doubt, which are certainly the whole law and all, if not more, to which the defendant was entitled. Defendant's crime was totally unprovoked and without a semblance of justification.

Wherefore, the whole court sitting, the judgment is affirmed.